**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**RICHARD RANDOLPH**                                                                                 **PLAINTIFF**

    **v.**                            **Cause No. 3:10 CV00135-BSM**

**B & K GROUP INC. d/b/a
BEST WESTERN BLYTHEVILLE INN**

**and**

**BNSF RAILWAY COMPANY**                                                             **DEFENDANTS**

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS MOTION FOR
SUMMARY JUDGMENT AGAINST DEFENDANT B&K GROUP**

Plaintiff submits this Brief in Support of his Motion for Summary Judgment against Defendant B&K Group, d/b/a Best Western Blytheville Inn ("Best Western"):

**INTRODUCTION**

This case arises against Defendant Best Western under the Arkansas common law of negligence as a result of serious injuries Plaintiff Richard Randolph sustained when a stair collapsed at Defendant's motel in Blytheville, Arkansas on September 7, 2009. Mr. Randolph is a 59-year-old railroad worker with more than 37 years of service. As a result of this fall, he injured his shoulder, hip, knee, back, cervical and lumbar spine, and neck. These injuries have prevented Mr. Randolph from returning to work, and appear to be permanent.

The Best Western is owned and operated by individuals without prior motel-operation experience. Best Western had been notified multiple times, at least nine months before the stair collapsed, that metal was rotting away in the south stairwell, and that it was in a dangerous

1

condition. Best Western has admitted it knew the stairwell was rusted and cracked, yet it failed to repair or warn of the dangerous condition on its property.

## UNCONTROVERTED FACTS

Plaintiff incorporates his Statement of Uncontroverted Facts in Support of Summary Judgment Against Defendant B&K Group as if fully set out herein.

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Arkansas Rules of Civil Procedure, summary judgment should be granted "when it is clear that there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law." *Lamar Advantage Holding Co. v. ASHC*, 253 SW 3d 914, 916 (Ark. 2007).

Arkansas courts grant summary judgment if, when viewed in the light most favorable to the nonmoving party, no issue of material fact is left unanswered by the evidentiary items presented by the moving party. *Fields v. Southern Farm Bureau Cas. Ins. Co.,* 87 S.W.3d 224, 226 (Ark. 2002). After the moving party "has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact." *Id*. Where the parties do not dispute the essential facts, the court may simply determine whether the moving party was entitled to judgment as a matter of law. *Jackson v. Blytheville Civ. Serv. Comm'n*, 43 S.W.3d 748 (Ark. 2001).

## ARGUMENT

To establish negligence under Arkansas law, a plaintiff must establish duty, breach, causation, and injury. In this case, the extent of Mr. Randolph's injuries remain disputed; however, the remaining elements have been established as a matter of law.

### A. Defendant Best Western had a duty to exercise ordinary care in protecting Plaintiff as he was a business invitee.

Under Arkansas law, land owners must use ordinary care to keep their premises reasonably safe for business invitees. *See e.g.*, Ark. Model Jury Instr., Civil AMI 1104 (2010); *Davis v. Safeway Stores*, 110 S.W.2d 695, 696 (Ark. 1937). Arkansas defines a "business invitee" as "one induced to come onto property for the business benefit of the possessor." *Lively v. Libbey Memorial Physical Medicine Center, Inc.*, 841 S.W.2d 609, 611 (Ark. 1992).

In this case, Mr. Randolph was the classic example of a business invitee of the Best Western, because Best Western was paid to provide him with a room. (Ex. 3—Answer of Defendant B&K Group, p. 1; Ex. 4—Motel Invoice.) Mr. Randolph had stayed at this particular hotel on several prior occasions. (Ex. 12—Depo. of Randolph, p. 87, 88, 89.) His stay was paid for by his employer, the railroad, with the railroad's permission, and Mr. Randolph was obligated to stay at the Best Western as part of his employment. (Ex. 4—Motel Invoice; Ex. 5—Depo. of Henry, p. 52-53, 55.)

The duty owed to a business invitee runs to both dangers which the landowner knows, but also to those which, with reasonable care, he might discover. *DeVazier v. Whit Davis Lumber Co.*, 516 S.W.2d 610, 612 (1974). "[I]f the act or omission is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others, then he is liable for any injury proximately resulting therefrom." *Bergetz v. Repka*, 424 S.W.2d 367, 369 (Ark. 1968). A motel in particular is "charged with the duty of taking all precautions for the protection of its guests which reasonable prudence and ordinary care would suggest." *Catlett v. Stewart*, 804 S.W.2d 699, 702 (Ark. 1991).

### B. Defendant Best Western breached the duty owed to Plaintiff Randolph because it knowingly failed to maintain the south stairwell in a reasonably safe condition.

The Best Western owed Mr. Randolph a duty to maintain its property in a reasonably safe condition. An invitee plaintiff can demonstrate a breach of this duty by showing: (1) the premises were defective; (2) the defect was caused by the owner, or was apparent, or should have been apparent through the exercise of ordinary care; and (3) the defect caused the injury (see Section C below). *Gann v. Parker*, 865 S.W.2d 282, 284 (Ark. 1993).

The premises of the Best Western were defective. A stair in the motel's southern stairwell broke in half as Mr. Randolph was walking down them. (Ex. 1—Complaint, p. 2; Ex. 3, p. 2-3; Ex. 10—Depo. of Khatrao, p. 14-15; Ex. 11—Photos of South Stairwell; Ex. 12—Depo. of Randolph, p. 93, 94-97; Ex. 13—Report of Inspection.) It is undisputed that a collapsed stair is a defective condition.

The defect was also apparent to Best Western as it was notified that the stairwell was rusty and needed to be replaced. With the exercise of ordinary care, a stair about to collapse should have been apparent to Defendant as concrete stairs reinforced with metal typically do not split in half unless there is significant deterioration over time. *See Marx v. Huron Little Rock*, 198 S.W.3d 127, 133 (Ark. App. 2004) (noting toilet lids typically do not detach from toilet assemblies if hotels use proper care). In *Marx*, a woman was sitting on a hotel toilet seat, putting on pantyhose, when the toilet lid broke off, causing injury. A jury finding in favor of the hotel defendants was reversed in part because the trial court failed to give *res ipsa loquitor* instructions to the jury, allowing them to infer some negligence from the fact of the injury itself. *Id.* Likewise, the injury Mr. Randolph suffered itself creates an inference of negligence.

Importantly, while the plaintiff in *Marx* relied on that inference of negligence, here Best Western had actual knowledge of the impending defective condition of the south stairwell long before it ultimately collapsed and injured Mr. Randolph. **Four years before** Mr. Randolph was injured, hotel inspections recognized rust accumulating in the stairwells of the Best Western. (Ex. 14—North American Quality Assurance Assessment 9-23-2005, p. 6.) Approximately **nine months before the accident**, motel owner Bahadur Dhillon was directly put on notice about the need for repairs by a repairman who told him that one or more stairs in the motel's south stairwell had started "rotting out" and would cause problems in the near future.[1] (Ex. 6, p. 17-19, 23-24; Ex. 7, p. 80.) The repairman, Robert Young, testified about December 2008 as follows:

> Q. And so will you tell me what happened in 2008 when I'm assuming Mr. Dhillor called you?
>
> A. Well, he called me up to come look at the stairway at that particular time, and so I went out and looked at them. And he asked me, what do I need to do. And I told him, I need to -- both sides needs to be repaired. Because at the time when I went up there and looked, I seen spots where the concrete had started -- where the metal had started rotting out. And I gave him a quote on both sides; but at that particular time, he only wanted to do one side.
>
> Q. Did Mr. Dhillor tell you what had spurred him contacting you? In other words, did he say that he noticed that there were problems or why exactly he was calling you?
>
> A. Yes. He said that he'd seen some spots. I guess he had looked at it his self, and he say he seen some spots but he didn't know exactly what. He just knew it wasn't right. And he was looking at it and he called me to

---

[1] On this point, Mr. Dhillon's testimony appears contradictory, saying both that he was told that he would have "additional problems with other stairs in the near future" (Ex. 7, p. 80) and that were "okay" and "didn't need any work" (Ex. 7, p. 110). We presume Mr. Dhillon's statements are both accurate, and that he was told that the south stairs were not so deteriorated as to pose a danger *in December 2008*, but would need repair *in the near future*. Nine months later, no repairs had been made.

>  make sure what he was looking at was what he thought it was. So that's when I come out.
>
> Q. Basically, he knew there was some type of problem, but he didn't know what it was, so he called you out?
>
> A. Right.
>
> Q. And you said you noticed problems on both the north stairwell and the south stairwell?
>
> A. Right.
>
> Q. Let's talk about the south stairwell first. Do you remember what exactly you noticed was wrong with those stairs?
>
> A. Well, what -- where the -- the metal part under the bottom where you pour the concrete in, it was rotting out. I guess after so long, what it does is -- I don't know how it does it, but it does. Metal starts rotting from the water and the corrosion through a period of time. And once it gets up under that concrete, it sits there. And something's got to give, being that that salt in there just sits in there. And after a period of time, that's what happens to that metal.

\
(Ex. 6—Depo. of Young, p. 17-19.)

Best Western was notified again of the conditions of the stairs by its franchisor, Best Western International. An inspector report dated December 11, 2008, says that the south stairs were in "marginal" condition and again noted rust. (Ex. 8—North American Quality Assurance Assessment 12-11-2008.)

The testimony of the motel's night shift auditor, Judy Gamble, further establishes that the stairs were known to have rusted supports and to be in deteriorating condition before Mr. Randolph was injured. (Ex. 9—Depo. of Gamble, p. 13-14.) Ms. Gamble testified about the state of the stairwell prior to the incident as follows:

    Q.  Other than paint peeling, did you notice anything else wrong with the stairwell?

    A.  There was, it was rusted.

    Q.  What do you mean by rusted?

    A.  The metal, it was rusted metal.

    Q.  Are you talking about the underneath the concrete stairs?

    A.  Underneath the brick, yes, that encased the steps.

…

    Q.  Were there any other stairs that had rust or was it just the one that collapsed?

    A.  The main one was the one that collapsed. I think there were some small spots on the bottom sides of a couple others but that was the main one.

    Q.  So the one that collapsed had the most significant amount of rust?

    A.  Yes.

(Ex. 9, p. 13-16.)

An owner of the Best Western herself testified that the concrete was cracked in the stair which ultimately collapsed:

    Q.  Is it your testimony that you did not see any problems in the stairwell before Mr. Randolph was injured?

    A.  I see this cracked line in there and we tell Bob. He say he talk to the guy. He said he do look it.

…

    Q.  And so if I understand you, a couple of weeks before Mr. Randolph was hurt, you told Bob that you saw a crack in the stairwell. Is that right?

    A.  Um-hum.

> Q. That a yes?
>
> A. Yes.
>
> …
>
> Q. I'm showing you a picture, this is marked as Exhibit 2, and this is the stair that collapsed with Mr. Randolph, okay?
>
> A. Ah-huh.
>
> Q. And so what I'm trying to find out is whether this is the same stair that you were talking about that had the crack in the concrete?
>
> A. Yeah, that one have the line.
>
> Q. So before Mr. Randolph fell?
>
> A. Do not have bottom like that before.
>
> Q. I understand that the crack would not have been this severe.
>
> A. Okay.
>
> Q. Before Mr. Randolph was hurt, and I understand that this stair was not cracked to this degree, but was this the same stair and the same location where that crack was before Mr. Randolph was injured?
>
> A. Um-hum.
>
> Q. Is that a yes?
>
> A. Yes.

(Ex. 10—Depo. of Khatrao, p. 10, 14-15.)

Because the south stairwell was defective, and because that defect was both apparent and should have been apparent to Best Western, the company breached its duty to maintain its property in reasonably safe condition for any injuries resulting from the defective stairwell.

### C. *Defendant Best Western's negligence injured Defendant Randolph.*

It is undisputed that the breaking stair caused Mr. Randolph to fall down a half-flight of stairs. (Ex. 1, ¶ 2; Ex. 3, ¶ 2; Ex. 10, p. 14-15; Ex. 12, p. 93, 94-97; Ex. 13.) As a result of falling down several stairs, Mr. Randolph immediately suffered injuries, the extent of which are disputed. (Ex. 1, ¶ 12; Ex. 3, ¶ 2.) Defendant Best Western has failed to provide any evidence suggesting that the fall never occurred, or that the stairwell did not collapse.

## CONCLUSION

There should be no dispute of material fact of Best Western's negligence. The Best Western owed Mr. Randolph a duty to maintain the safety of its property in a safe condition. It breached that duty in failing to repair or close the south stairwell even though it knew of the defects. Best Western's breach of its duty resulted in serious injuries to Mr. Randolph.

Therefore, Plaintiff Richard Randolph respectfully requests that this Court enter an order granting his Motion for Summary Judgment Against Defendant B&K Group, d/b/a Best Western Blytheville Inn as to liability under Count I of the Complaint, leaving for trial the assessment of the nature and extent of Plaintiff's damages.

Respectfully submitted,

/s/ Joshua D. Margolis
Joshua D. Margolis, Pro Hac Vice
SCHLICHTER, BOGARD & DENTON
100 South Fourth Street, Suite 900
St. Louis, Missouri 63102
(314) 621-6115
(314) 621-7151 (fax)
jmargolis@uselaws.com

and

Charles Banks, ABN 73004
Robert Francis, ABN 2007032
BANKS LAW FIRM, PLLC
100 Morgan Keegan Dr., Ste. 100
Little Rock, AR 72202
(501) 280-0100
Fax: (501) 280-0166

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing was served, by First Class United States Mail, Postage Prepaid, and electronically, on the following counsel of record this 21st day of July, 2011:

Barry Deacon
Alfred Angulo
BARRETT & DEACON, P.A.
P.O. Box 1506
Fayetteville, AR  72702
dangulo@barrettdeacon.com
bdeacon@barrettdeacon.com

**ATTORNEY FOR DEFENDANT BNSF RAILWAY COMPANY**

Richard A. Reid
REID, BURGE, PREVALLET & COLEMAN
417 North Broadway Street
P.O. Box 107
Blytheville, AR   72316-0107
rreid_rbpc@sbcglobal.net

**ATTORNEY FOR DEFENDANT B&K GROUP, ET AL.**

                                             **/s/ Joshua D. Margolis**